# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOVAN WINBUSH,

        Defendant-Appellant.

UNPUBLISHED
February 10, 2015

No. 318213
Kent Circuit Court
LC No. 12-008827-FC

Before: O'CONNELL, P.J., and SAWYER and MARKEY, JJ.

PER CURIAM.

Defendant, Jovan Winbush, appeals as of right his convictions of three counts of armed robbery, MCL 750.529, and one count of possession of a firearm during the commission of a felony, MCL 750.227b, following a jury trial. The trial court sentenced Winbush to serve concurrent terms of 10 years, 6 months' to 25 years' imprisonment for his armed robbery convictions and a consecutive term of two years' imprisonment for his felony-firearm conviction. We reverse and remand for a new trial.

## I. FACTS

Edmond Nevills testified that he, Winbush, Julian Mercado, and some others were at a home on 31 Andre Street in Grand Rapids on August 19, 2012. Winbush testified that Mercado was drunk. According to Nevills, at around 8:00 p.m., Mercado became angry because he believed some money was missing. Mercado brandished a chrome pistol and left the house. Nevills and Dajon[1] accompanied Mercado. Mercado approached a group of Hispanic men, pulled his gun, and began to rob them.

Wilmar Pelaez testified that he and his friend, Xavier Pagan, left his house at 36 Andre Street to go to the store. According to Pelaez, while he and Pagan were walking, Mercado and three African American men approached him and demanded money. When Pelaez declined to

---

[1] It is not apparent from the transcripts whether Dajon was the person's given name. No witness provided a surname for Dajon. However, a juvenile later pleaded guilty in juvenile court to assault with intent to rob while armed in relation to the offense.

-1-

give Mercado money, Mercado pointed a pistol at Pelaez's forehead. At that point, Migel Aguilar approached and asked what was happening.

Aguilar testified that he was near the intersection of Division, Cutler, and Andre streets to visit a friend. According to Aguilar, while he was walking, he saw Mercado and three African-American men robbing Pelaez, the son of his friend, at gunpoint. During the robbery, someone punched Aguilar in the jaw and demanded money. Someone hit Pagan several times. Aguilar and Pelaez testified that one of the men was wearing a shirt with red squares on it. Pelaez testified that the man in the shirt with red squares was one of the men who hit Pagan.

Pablo Reinoso testified that he was driving south on Division near Cutler and Andre Streets when he saw Mercado pointing a pistol at Aguilar. According to Reinoso, two African American men were also present, and one of them was hitting Aguilar. Reinoso knew Aguilar because they worked together. Reinoso told his 12-year-old daughter, who was with him in the car, to call the police.

Winbush testified that shortly after Mercado, Nevills, and Dajon left the house, he asked his friend Aaron Huntington to give him a ride to "see what's going on." Huntington testified that he gave Winbush a ride from 31 Andre Street to the corner of Division. Winbush testified that, as Huntington drove toward the corner of Division and Cutler, he saw Mercado, Dajon, and Nevills fighting with some Hispanic men. Huntington testified that he heard someone say "you're all some b*** a*** if ya'll don't stop," and then he dropped Winbush off at the corner of Division and Cutler.

Nevills testified that Winbush arrived shortly after Dajon began hitting someone. Winbush testified that he got out of the car, grabbed Mercado, asked him what he thought he was doing, and told Mercado to leave. Nevills testified that Winbush "tried to stop the whole thing" and told Mercado that he was "stupid for trying to rob somebody." Aguilar testified that no one said "this is stupid," "let's get out of here," or tried to help the victims during the robbery. Pelaez admitted that he had testified at Mercado's trial that it was true that one of the African American men was yelling "let's get out of here . . . [b]ut [Mercado] wanted to keep on."

According to Nevills and Winbush, Nevills, Dajon, Mercado, and Winbush then returned to 31 Andre Street. Pelaez and Reinoso testified that they saw the men enter the house and told the police. Nevills testified that he and Dajon left the house in Huntington's car, but Winbush declined to leave because he did not do anything.

According to Reinoso, Winbush emerged from 31 Andre Street shortly after the robbery and began "walking along as if nothing happened." Aguilar testified that, minutes after the robbery, he saw the man with the distinctive shirt walking toward the parking lot. Reinoso identified Winbush as the man who had been hitting Aguilar. Aguilar testified that he told officers that the man in "the square shirt" was one of the men who robbed him. However, Aguilar testified that he was not sure that Winbush was one of the robbers because he mostly looked at Mercado during the robbery. He testified that he identified Winbush because he recognized his shirt.

## II. ANALYSIS

Winbush contends that the trial court erred when it allowed the jury to hear evidence that Nevills had been convicted of murder and that, in this particular case, the error was not harmless. We agree.

This Court reviews for an abuse of discretion the trial court's evidentiary rulings. *People v Duncan*, 494 Mich 713, 722; 835 NW2d 399 (2013). A trial court abuses its discretion when its outcome falls outside the range of reasonable outcomes. *Id*. at 722-723. We review de novo the preliminary questions of law surrounding the admission of evidence. *Id*. at 723.

Evidence of a witness's prior conviction creates the danger that the jury "will misuse prior conviction evidence by focusing on the [witness's] general bad character, rather than solely on his character for truthtelling." *People v Allen*, 429 Mich 558, 569; 420 NW2d 499 (1988). MRE 609 provides that, "[f]or the purposes of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall not be admitted" unless the crime meets certain requirements. The trial court may admit evidence of a conviction only if the crime (1) contained an element of dishonesty or false statement, or (2) contained an element of theft, was punishable by imprisonment in excess of one year, and, if the witness is the defendant, the probative value of the evidence outweighs its prejudicial effect. MRE 609(a)(1) and (2).

During trial in this case, the prosecutor asked Nevills if he was in jail for an offense. Defense counsel objected and the parties approached the bench. When the parties came back onto the record, the following exchange took place:

> *[Defense Counsel]*. Your Honor, just for the record, I would object to any questioning as to why Mr. Nevills is in custody. I do not believe it's relevant at this time. Thank you.
>
> *The Court*. I'll overrule that. At a later point I can explain on the record why.
>
> By *[the Prosecutor]*:
>
> *Q*. Mr. Nevills, on August 3rd of 2012, about 16 days before this robbery, you killed a man next to 31 Andre, didn't you?
>
> *A*. Yes, sir.

The prosecutor subsequently elicited that the murder took place in a driveway near 31 Andre Street; Mercado was with Nevills on the day of the murder; Nevills initially implicated Mercado in the murder; he used a gun in the murder; he ran and got rid of the gun, and he later confessed to committing the murder. The prosecutor asked Nevills if he expected the jury to believe that he followed Mercado into the street when he was hiding from the police as a murder suspect, to which Nevills responded affirmatively.

Following the prosecutor's questions to Nevills, the trial court instructed the jury:

> The fact that the witness has said he committed a murder or whatever doesn't mean he can't tell the truth. A person who commits a crime like that can be just

-3-

as honest, I suppose, as anyone else. And I don't want you to decide his credibility based upon whether he committed a serious crime, which really has nothing to do with truth and veracity. This isn't like a theft crime, it's not like a perjury crime or something like that. It's a crime of violence and it isn't related to whether someone is truthful or not.

The reason I'm letting you hear about this is because of the seriousness of that crime and how that might relate to the defendant's [sic] willingness and ability to testify here in court today, and you can consider issues of credibility if there's some because of this conviction, and presumptively a relatively lengthy sentence, whether that might be a factor why the defendant—why the witness here might not be credible or honest. . . . But the mere fact that he has acknowledged being involved in a murder, that in and of itself is not a reason to believe or disbelieve his testimony, but there may be other factors relating to that that would have a bearing on a person's decision about whether to be honest or whether to be not truthful in testimony. And those type[s] of things you can take into account.

After the trial court dismissed the jury, the parties placed their full arguments on the record. Defense counsel contended that Nevills's conviction was irrelevant because it was "not a crime of theft, dishonesty, deceit, false statement, which would have been properly impeachable." The prosecutor contended that evidence of the conviction showed that Nevills might "not be completely honest because he's doing a lot of years in prison that would be eaten up by any type of perjury charge." The trial court explained, "I recognize that generally speaking the fact that someone has been convicted of a murder, as an example, would not be allowed in relative to the character of the witness or whether the person is being truthful or not." However, the trial court stated that in this case Nevills's conviction was relevant because Nevills was serving a lengthy prison sentence and did not have the same incentive to testify as truthfully as others might.

We conclude that the trial court erred by admitting evidence that Nevills was convicted of murder. It is undisputed that the crime of murder has no elements of dishonesty, false statement, or theft.[2] As the trial court recognized, the fact that a witness committed murder is not admissible for the purpose of attacking a witness's credibility. And, while the amount of time a witness is serving in jail may be relevant on issues of credibility, see *People v Clements*, 91 Mich App 103, 108; 284 NW2d 132 (1979), the prosecutor did not merely seek to admit evidence that Nevills was serving a lengthy prison term. Rather, the prosecutor sought to, and did, admit extensive evidence about Nevills's murder conviction itself.

The prosecutor contends that evidence of Nevills's prior conviction was relevant to show Nevills's possible bias. The trial court has broad discretion to permit a witness to be cross-examined on any relevant issue. *People v Layher*, 464 Mich 756, 765; 631 NW2d 281 (2001). Evidence of a witness's bias is almost always relevant to the witness's credibility. *Id*. at 764.

---

[2] See *Allen*, 429 Mich at 593 n 15 (the proper test is to examine the elements of the crime).

However, the trial court's discretion is constrained by other rules of evidence. *Id*. at 765. Bias is an issue of credibility, and MRE 609 bars the use of prior convictions to attack a witness's credibility. We conclude that the prosecutor's position lacks merit because a party may not use a prior conviction to attack a witness's credibility on the basis of bias if MRE 609 bars admission of that evidence.

The prosecutor also contends that even if the trial court erred, its error was harmless error that does not justify reversal. We disagree.

A preserved error in the exclusion of evidence is grounds for reversal only if it affirmatively appears that it is "more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999). An error is outcome determinative when it undermines the reliability of the verdict. *Id*. at 495. Evidence may undermine the reliability of a verdict if the case "presented a true one-on-one credibility contest." *People v Snyder (After Remand)*, 301 Mich App 99, 112; 835 NW2d 608 (2013). When the impeaching crime is murder, it is particularly dangerous that the jurors will improperly use the evidence. *Allen*, 429 Mich at 577. The use of a limiting instruction does not necessarily safeguard against misuse. *Id*. at 574-578.

After our review of the record, we conclude that it is more probable than not that the error undermined the reliability of the verdict. First, this case hinged on a credibility contest. Pelaez and Aguilar testified that Mercado and three black men were involved in the robbery. Pelaez testified that Winbush was involved in the robbery. Aguilar testified that he recognized Winbush's shirt, but he was not certain that Winbush was one of the robbers. In contrast, Winbush did not deny that he was at the scene of the robbery, but he testified that he arrived at the scene to attempt to put a stop to the robbery. Nevills's testimony corroborated that Winbush was not involved in the robbery and attempted to break it up. Essentially, Winbush's conviction hinged on the jury's decision whether to believe Pelaez and Aguilar's account that Winbush was involved in the robbery or Winbush and Nevills's account that Winbush arrived while the robbery was in progress and attempted to stop it.[3]

Second, Nevills was convicted of murder. As noted by the Michigan Supreme Court in *Allen*, it is particularly dangerous that the jury may improperly use evidence of a murder conviction. We recognize that the trial court attempted to limit the improper use of the evidence with a jury instruction. However, the trial court's rambling instruction was far from clear concerning whether the jury could consider Nevills's status or only his lengthy sentence. And, even had the trial court issued a clear limiting instruction, it would not necessarily have guarded against improper use of the evidence. See *Allen*, 429 Mich at 575-578.

---

[3] Reinoso testified that he saw Mercado and two black men robbing Pelaez and Aguilar. Reinoso's testimony did not foreclose the possibility that Winbush arrived while the robbery was in progress and either participated or attempted to break it up. Similarly, Huntington testified that he dropped Winbush off at the corner of Cutler and Division, but this testimony also did not weigh toward whether Winbush participated in or attempted to break up the robbery.

Third, despite the prosecutor's stated reason for admitting evidence of Nevills's conviction, the nature of Nevills's conviction was not a passing reference in the context of the larger scheme of the prosecutor's case. The prosecutor repeatedly used the *nature* of Nevills's crime to contend that the jury could not believe him in this case. For instance, the prosecutor specifically attempted to impeach Nevills by asking during cross-examination, "You want this jury to believe that while you're hiding from the police for committing a murder right next door to 31 Andre, you follow a mad gunman from 31 Andre onto the busy corridor of Division?" Further, the prosecutor used Nevills's murder conviction to argue in closing that the jury could not believe Nevills when the prosecutor argued that the jury could not believe Winbush's account because "[h]is eggs are in the basket of Edmond Nevills, an admitted murderer . . . ."

Considering the nature of the case, the nature of the error, and the prosecutor's repeated use of the improper evidence, we conclude that it is more probable than not that the improper admission of Nevills's murder conviction undermined the reliability of the verdict in this case. Given our resolution of this issue, we need not address the remainder of Winbush's issues on appeal.

We reverse and remand for a new trial. We do not retain jurisdiction.

/s/ Peter D. O'Connell
/s/ David H. Sawyer
/s/ Jane E. Markey